The last case is Unre Raymond Rivera and Carl Neuberger, 2009-11-23. Mr. Collins, we're ready when you are. Thank you, Your Honor. May it please the Court. The technology we're dealing with here are wound magnet rolls, basically an arts and crafts device. It wounds up, and one of the problems with these is when you put adhesive on one side, you can stick it to a sticker. You roll it up, it wants to stick to the other side. Your problem is all the pieces are in the prior art, right? The elements are decided by the examiner, a lot of the elements of the prior art. And the Supreme Court has spoken in KSR and told us that in such a case, there's usually a presumption of obviousness. I don't believe they said there's usually a presumption of obviousness. They said that there's an apparent reason it must be made of the elements of the prior art. They decided KSR in summary judgment, without sending it back. Well, I understand how KSR was decided, but the ruling of KSR, the holding of KSR is still, there's no rigid application of the TSM test, but there still must be an apparent reason for the combination. And part of our argument also is some of the references teaches away, and some of the quote-unquote prior art cited by the Board really isn't prior art at all. And where I'd like to start off is on that issue. One of the issues raised in the rejection is the, you know, really the combination is this JP234 reference, also called Takashima, which has a self-wound magnet with a release layer on the back. It's a different approach to it. Then there's Young, which is a PCT application, which has a release layer with a silicone release agent, and an acrylate group, an adhesion promoter. Then the third reference is Sodomer 9051. CD 9051 is a specific Sodomer formulation, and Sodomer is relied upon as the adhesion enhancer. And on the issue of Sodomer, really there were two more references, and I use the term reference a little bit loosely. One is the Board relied upon what it alleged to be an admission by the applicant, and we submit the reliance on that admission was actually quite wrong. What the Board found was that the admitted prior... But these are all prior art. You've questioned really almost whether they're prior art, but they are prior art, right? You're questioning what they say. No, yes and no, because the Board found the admitted prior art to be more than it was. What was admitted by the applicant and really never disputed is that Sodomer CD 9051 existed. It was out there. The Board found further that it was known for use on magnetic substrates, and that's a huge distinction because the applicants never said that. The applicants' exact language actually was it is useful, an adhesion enhancer is useful to promote the adherence of the release coating layer on the magnetic substrate. That's not an admission that it was known to use Sodomer for that purpose by others. It's a recognition of the applicant's invention that the applicant determined it to be useful on that. When that leg on the table, that is the prior art rejection, is pulled off from under it, that was a critical reasoning on why the Board thought it would be obvious to use Sodomer. Now they've got Zoo. How do you pronounce it? Zoo, I believe, is how it's pronounced, but it's spelled X-U. Zoo says 9012 works on plastics. No, actually, you've got to consider the issue of analogous prior art, too. For a piece of prior art to be considered analogous under this Court's precedent, in Rayclay, for example, there's a two-part test. It either has to be in the same field of endeavor. Well, that's clearly not an issue here. We're dealing with a wound magnet for an arts and crafts purpose. Zoo is directed to an optical waveguide, and Sodomer CD9051 is one of maybe 50 different compositions. It's notes for controlling the refractive index between layers of an optical waveguide. So it's clearly not in the same field of endeavor. The second part of the test is wouldn't we... If an applicant puts an issue, a specific question, whether 9012 will work on plastic as the enhancer, then why isn't the examiner entitled to look at literature about 9012 to see what it does work on? The question would be, though, how does one get to Sodomer CD9051? There's got to be some apparent reason someone would meet... If you Google 9021 and said it doesn't work on plastic, Zoo's going to pop up right away. Therein lies the problem. That, I respect with some of this hindsight. If the examiner sits down and Googles CD9051, he's already made the determination that it should be in the rejection. He's made the determination that the combination has been made. Why wouldn't it have been obvious to try 9012 anyhow? Basically, the reference has got a whole slew of these applications, and they say this stuff works on plastics, metal, glass, and other substrates. Are you referring to Sodomer's reference at all? Actually, it's specified for metals. And it's specified, and if you look at the characteristics that Sodomer CD9051, assuming someone would have referred to it in the first place, that's sort of the hindsight question. Once you put the combination together, it sure looks obvious in the past. But it's designed for metal, and its characteristics are water-resistant. 9051, right? Yeah, 9051. And it's water-resistant, which, frankly, for this application, nobody cares about. When you put the picture on the front of the magnet, and you put the magnet on the fridge, the release layer is facing the fridge. If you have water running down the front of your fridge, you get a lot bigger problems. But 9051 doesn't say use it on metal only. Actually, that's the specification. I believe it's for metal uses. 9051 is a tri-functional version of 9050. Okay, 9050 talks about metal. I got you. Yeah, that is correct. So it's really teaching. It's something for adhering coatings to metal. As you can imagine, most metal structures, a lot of them are outside. Water resistance is one characteristic, which has no bearing on some kind of magnetic effect. Just to help me out, assume that you lose on ZOO. I mean, your argument is that it was improper for the board to consider ZOO. If you lose on ZOO, then what's your response to the presiding judge's initial thrust to say that the combination If you lose on ZOO, then all the elements in the claim are in the art. I guess you lose on ZOO or the question of the issue of the admission. Well, let's just say you win on admission and you lose on ZOO. So then we've got all the elements of the invention are in the prior art. The one great thing about that. Well, the one issue here, though, is what you end up doing is going back to a rejection that the examiner already withdrew. And for this CCPA case in Ray Margolis, a rejection that the examiner had considered, already considered, withdrew below. Responding to the presiding judge's question would be just a preliminary will happen to the next appeal. Because if we remanded on the grounds that there was an error in process here, that's one of your arguments is it's fouled because the examiner never entered a rejection that didn't include ZOO. He did enter a rejection that included ZOO. And then he came back and he put ZOO in at the end, right? But what happened was he started off with. Can't pronounce the name of it. Yeah, he started off with JP2. He started off with what I believe to be the presiding judge's question was the three elements of the prior art. He started off with JP234, which shows the basic magnet. Young. And this question about 9051 on plastics came up and the examiner cited something. I can't remember, can't pronounce the name of it. And you traversed that. And so that's crazy because you didn't understand that that doesn't apply to plastics. And you won. And so then he stuck ZOO in. That's correct. So what I'm trying to say is, and you're saying, well, what's happening here is that the solicitor doesn't want to talk about ZOO because it's sort of embarrassing. So isn't that your argument that the solicitor is asking us to affirm the board on a ground other than the board used for its rejection? Am I missing something? I think actually affirming the board on a ground that was not its rejection isn't proper because this is not an issue where there was some minor error in the thing or in the rejection. What you actually would be reverting to is essentially, my view of the solicitor's position is, okay, even if you ignore ZOO in this admitted prior art issue, you really end up going back to the first three references. And that's something, if you look at really what I believe we're talking about is a harmless error analysis. The question is, would the outcome have been different? And the only thing that the record shows us is yes because the examiner withdrew that rejection. It would be unfair to enter a rejection, essentially what the decision would be, that is inconsistent with the office's very own outcome. So the one other prong, actually if I may on ZOO because it was a two-part test and I don't believe I actually said the second part, was for it to be considered an analogous prior art and scope of the prior art is something that's considered under the Graham factors. The Supreme Court's KSR chase never changed Graham's requirement to consider the scope of the prior art, is that the reference must be reasonably pertinent to the problem with which the inventor was involved. Here, Mr. Rivera, Mr. Neuberger were trying to figure out how to keep the backside of the magnet from sticking to the adhesive when it was rolled up without the use of a separate release liner. That doesn't sound like a scope issue, it sounds like an analogous art issue. An analogous art issue, right. Which the Supreme Court did say you can't be too strict on that. Right, well I always viewed the scope of the prior art as determining what prior art would be considered by the inventor and that's the prong of it I was referring to, not the actual teaching of the art itself. So what I am talking about is the analogous art test. Well, optical waveguides, they don't roll up, they don't have a release layer, they don't have an adhesive that really sticks to anything that is a release layer, and they don't have layers that separate from one another. So if one were considering the problem that Mr. Rivera was facing, certainly an optical waveguide is not the place that one would consider anyone to have actually considered or dealt with a problem, or even a problem that's remotely like that. So for those basic reasons, we're submitting that ZOO cannot be relied on as an analogous reference. I see that I'm into my remodel time and I don't want to run over. We'll save it for you. Great, thank you very much. Mr. Johnson. May it please the Court. It's undisputed that the claimed inventions are all part of the prior art that's found in J.P. 234, Jung, and Sardimer. Mr. Rivera argues that Sardimer only recommends use on a metal substrate. However, Sardimer itself discloses that it can be applied to various types of substrates, including plastic, metals, and other types of substrates. There's nothing in Sardimer itself that says that it cannot be applied to non-metals. Great, but the final office action that resulted in the appeal to the Board wasn't a rejection of 234, Jung, and Sardimer. It was ZOO. It also included ZOO, that's correct. So if ZOO is wrong to consider ZOO, then doesn't the Board decision fall? No, it does not, and we disagree that it was wrong to consider ZOO. Well, I know, but let's just work through it. Let's assume we take ZOO out. We say, well, you can't tax ZOO as an admission by the applicant. We think that's wrong, and it's not anywhere near the prior art, the relevant field, so you throw ZOO out. Wouldn't we have to vete, remand, do something else? And that's the rejection, right? That was what was affirmed by the Board. When you look at the actual rejection, you see that ZOO was only relied upon as further evidence that Sardimer could be applied to non-metals. In other words, you're saying ZOO isn't even necessary. That's correct, Your Honor. The language was exactly as evidenced by. As evidenced. Weren't those the exact words? Those were the exact words, Your Honor, so it was merely evidence that confirmed the teachings that were found in Sardimer itself. So it's our position that ZOO was only relied upon for this. As evidenced by was the examiner's language, right? That's right. That's not the Board's language. That is not, and if you're looking for it, that could be found at 887, I believe, Your Honor. Well, I'm looking at the Board decision at page A, bunch of 07. It says ZOO teaches. It's a promoter useful for plastic substrates. And that kind of language, teaches, that's the kind of language you use when you're referring to prior art, right? That's correct, Your Honor. As opposed to confirming something that's in somebody else's program. It is, and yet when you look at what the examiner was getting at, it was really to show that it was merely further confirmation as to what the teaching was. But the more that's piling on, Sardimer teaches adhesion-promoting products. That's correct, Your Honor. That's correct. And so all that the agency was doing was merely relying upon it to confirm what Sardimer ultimately teaches. And with respect to ZOO being non-analogous art, it's really Sardimer that we're looking at. Sardimer was the analogous art, and again, ZOO was merely being relied upon to confirm the teachings that were found in Sardimer itself. And as I briefly touched on... But you maintain in your brief, do you not, that ZOO is pertinent prior art, and could be used as prior art. Don't you say that in your brief? That's correct, Your Honor. If we gave you that, I mean, my goodness, that's manna from heaven. I mean, you can take something that's found in aerospace prior art and apply it to making bird feeders, right? If we were to rule that way. That would be a terrible mistake, wouldn't it? Well, I don't think so. If you consider it to be an artful language... Aerospace art to somebody who's working on bird feeders? I'm sorry? Aerospace art to someone who works in bird feeders? You're going to attack one ordinary skill in the art of making bird feeders with the knowledge of what Boeing does? Right, but you have to look at the reason why ZOO was actually cited in the first place, which was merely to confirm that CD9051 could be used in a way that was different from... Did you have the examiner's final office action on deals with ZOO at your fingertips? Yes, that's at 87, Your Honor. Are you saying that an adhesion promoter is an adhesion promoter wherever it's used? And if one wants an adhesion promoter, whether it's used for a Boeing 707 or a birdcage, it's known as an adhesion promoter. That's right. It's going to function in the same way. And that's what's going on here where Rivera was merely gathering together known elements and having them perform in the same way that they've been known to perform. And under KSR, that makes his combination obvious. And that's part of the problem that the board and the examiner pointed out in their rejection. Your adversary mentioned that in a passing way, but it's an important part of his argument, a teach-away point on one of the references. Yes, Your Honor. What's your response to that? I believe his teaching-away argument was with respect to Sardimer and it only recommending its use on metals. I thought it was young. I didn't hear that during his opening discussion. No, but it was in his brief. Yes, Your Honor. With respect to Jung, Jung does not teach away. He argues that Jung teaches a high unwind force. However, there's no language at all in Jung that discloses that it teaches a high unwind force. What it states is that if the unwind force is too high, then the release layer could stick to the adhesive layer. So Jung says if it's too high, it's not good. If it's too low, it's not good. So you have to dial it in where you need it. That's correct. And there's expressed language in Jung that says it was known to use the release layer to decrease the unwind force and to adjust the unwind force. So one of ordinary skill in the art, reading that language, would know that. He said not only does it teach away, it teaches too. It teaches too to make the release layer at an optimum level for the particular needs of the user. So there is no teaching away that's found in Jung at all. It teaches as you just mentioned. You discount the secondary considerations on the ground that it's either just a turning argument or it's unsubstantiated. In the patent office, what's an applicant to do? How does an applicant present secondary considerations in such a way that the patent office would say, at least we have to consider it? I mean, here you had the inventor. Was the inventor testifying that he thought there was a long-felt need? Yes, sir. Well, why isn't that good enough? He's one of ordinary skill in the art, isn't he? Well, I just want to back up for just a moment. The board did consider the secondary considerations, but they found it to be unpersuasive. Well, essentially because it was unsubstantiated. It was vague. It was almost like it didn't qualify under St. Albert. It's not good evidence, right? Well, there are a number of ways that secondary considerations can be proven. One is by submitting an affidavit showing whatever it is that's being alleged by an objective third party. An objective third party. Exactly, Your Honor. So you're saying if it comes out of the mouth of the applicant, it's more easily dismissed? Well, it goes to the weight. It goes to the weight in which the evidence is ultimately given. And here, what Mr. Rivera is arguing that he was the first to come up with a rolled magnetic sheet that doesn't have a release liner. However, that's not true. The JP234 reference, which came out before his application, ultimately taught that. So his argument with respect to his secondary consideration fails based upon the evidence of record. If there are no further questions, then I will. Thank you, Mr. Johnson. Mr. Collins has a little rebuttal time. Thank you very much. The one question I would like to address shortly on the zoo issue is when it's being considered in the rejection. I think I've already stated our position that we believe it must. That's the rejection that's being considered. And the language of the board was very clear that it was part of the rejection. I mean, you cited it correctly that it's teaching. But even so, an adhesion promoter is an adhesion promoter. If one wants an adhesion promoter, there are people who deal with materials that adhere, who would know of adhesion promoters, even if they've been disclosed for other purposes. Well, the adhesion promoter is in Young. What the adhesion enhancer in Sodomer is being used is to drive some of the cross-linking functionality in the adhesion promoter. It's actually not the adhesion. It's not the adhesion promoter. It's the adhesion enhancer. And it's really designed for other things. And that kind of gets into the Young issue. Young's system is designed for really what are exactly high-unwind force applications, packing tape, packaging, very tense forces. And it's actually something that doesn't readily stay on magnets. That was the problem. So finding the solution was very difficult. That actually leads into this long-felt need issue. And I think it was mischaracterized that Ray Revere said I'm the first one who sat down and had a self-wound one, that the first one that worked is what he was saying, because the problem was— But that's long-felt need. That was just his opinion. No, what he was saying is— He wasn't presenting data, or he wasn't presenting an affidavit from an outside person knowledgeable in the field. It was just argument. I think that's an unfair characterization because his point on long-felt need is a negative. He says, I've been in this field for 20 years. I'm aware of 40 to 50 years of these magnets being out there. And I can tell you that the paper is a waste. It's no benefit to the end user. It requires additional manufacturing complexity to roll it up, and it costs money. For 40 to 50 years, people have been unnecessarily spending money on that because they didn't have a solution like I did. Is the product that your client had in mind this sort of roll that— Obviously, they want me to cut it up and stick a picture of my grandson on it and put it on my icebox. Sure. And so is what they're selling a roll of this stuff? Yeah. And you have your own little machine to cut it? It's a roll, and frankly, they have a laminator. You put it in, and it's got a film on it. But if you, for example, were—assuming they were the size of this little pad of stickies, and if you wanted to have, say, six of them in a package and sell them at CVS, then you'd have to put that protective coating on. The thing that you claim is a great idea to throw away because it's wasteful because otherwise they'd stick to each other. Or in that situation, you could use exactly what you're holding, a strip of removable adhesive like the pad. You'd have to put something in that is the genius of this invention to get rid of it. But to get rid of the separate piece of paper, and that's the genius of it. And so Mr. Rivera, I think he's qualified to say this, and that's kind of the problem is they're saying, well, you didn't prove to us that there's none out there. Well, the problem is there were none out there except for that attempt by J.P. 234, which he said, and it's not a matter of opinion, he's an expert in this field, factually that the approach they use kills the magnet. It destroys its magnetic property. So they tried, and the J.P. 234 inventors fell flat on their face, and what he said is his is the first workable and available, and that's much different than the first attempt. And if you have no more questions, that would conclude the presentation. Thank you very much, Mr. Collins. Thank you very much. We'll take the case under advisement. All rise. The Honorable Court is adjourned from day to day. Thank you.